JOHN L. MANOR, et al. v. J. P. NICELY, et al.

Eastern Section. October 31, 1925.

No petition for Certiorari was filed.

1. **Pleading.** Under an answer alleging damage to the defendant by the plaintiff, the defendant may off-set the recovery of the plaintiff.

In an action upon a contract where the answer of the defendant alleged that plaintiff's breach of the contract had caused defendant damage greater

that the amount asked by the plaintiff, **held,** that under such pleading the defendant might show damages that would off-set the claim of the plaintiff, but that the defendant could not recover anything additional.

2. **Damages. Evidence. There must be evidence of specific losses before there can be a recovery in damages.**

In an action on a contract where the defendant alleged damages caused by plaintiff's breach of contract, but the evidence showed no specific losses on the part of the defendant, **held** that there was no evidence to justify the finding of anything other than nominal damages.

Appeal from Chancery Court, Union County; Hon. M. H. Gamble, Chancellor.

Modified and affirmed.

Turner, Cate & Cate, of Knoxville, for appellant.

W. P. Monroe, of Knoxville, for appellee.

SNODGRASS, J. The bill in this cause was filed by complainants John L. Manor, T. M. Atkins and P. E. Collett, against J. P. Nicely & So., a partnership composed of the said J. P. Nicely, B. V. Nicely, Leon Nicely and B. H. Nicely, to collect an advancement made on a purchase of the tanbark on a certain tract of land, at the price of $7 per cord, or ton, its equivalent.

The bill averred that on the 5th day of November, 1919, the complainants entered into a contract by which the defendants sold to them all the chestnut oak tanbark on all chestnut oak timber on a tract of land situated in Union county, Tennessee, known as the John Miller tract, containing 400 acres more or less; bounded on the North by lands of Ousley; on the West by Clinch River; on the East by Dixie Highway; and on the South by Needham and Borum; that said tanbark was to be cut and removed during the season of 1920, if practicable and, if not, the bark not removed during 1920 was to be cut and removed during the season of 1921, with rights of ingress and egress necessary to getting out such bark; that the complainants were to pay the defendants $7 per cord for said bark, and that tannery weights and inspection was to control; that complainants paid $3,000 in cash, and the balance was to be paid when they had delivered the bark at the tannery of the Schlosser Leather Company and the same had·been weighed and inspected and paid for by said Schlosser Leather Company; that complainants did cut and remove all of the chestnut oak tanbark on said tract, and that the total amount of same was 392 tons; that the said 392 tons was delivered to the said Schlosser Leather Company, and that the amount received by the complainants for same was $2,745.11, leaving a balance due the complainants from defendants on the $3,000 advancement $254.89; that complainants had repeatedly requested the defendants to refund the above stated amount, but that said defendants have failed and refused to do so. The bill prayed for process, that

defendants answer, but not on oath; that on the hearing complainants have a decree for the amount due them from defendants, as stated in the bill, and for such other, further and general relief as they may be entitled to.

The joint answer of defendants was filed practically admitting every allegation of the bill, except it was stated that either tannery or railroad weights were to govern. They denied the 4th paragraph of the bill, in which it was stated that all of said chestnut oak tanbark was cut and removed from the said tract, and demanded strict proof of the same. They averred that the truth of the whole matter is that complainants did make and enter into a contract, the terms of which is set forth in a copy of a contract which (it was said) the complainants now have their possession, and that a copy of the same was by the terms of said contract left in the possession of respondents; that the complainants failed in many ways to carry out the provisions and terms of said contract; that they failed and refused to cut and remove all the tanbark contracted to be cut by them; that they failed and refused to cut the timber from which the bark was to be removed according to specifications. As to this it was averred that they were to cut the trees from which the bark was to be removed with the saw, as was incorporated in the contract; that they failed to peel all the bark off the trees that they did cut as provided in said contract; that they failed to remove from the woodland the entire amount of bark peeled by the complainants, and left the same in the woodland to spoil and rot, in violation of the contract; that the complainants so cut the timber as to require the respondents considerable cost and expense in removing and cutting the timber from which the bark was peeled to their own advantage, and to the great damage of respondents; that complainants agreed to cut the timber with a saw, and instead of doing so they cut the trees down with an axe, and in this way bursted many of the trees and spoiled them, so that it was a great loss to the respondents; that complainants and their agents so cut the timber that it cost the respondents considerably to prepare by additional work the timber from which the bark was removed for the saw; that it was true that respondents have failed to repay to complainants the amount of money sued for in their bill, for the reasons that the complainants failed to comply with the terms of said contract, or any part thereof; that respondents plead a breach of said contract on the part of complainants as a bar to this action, and here and now state to the court that the respondents are damaged by far more than the claim of complainants as set out in this proceeding, and the exact amount of damage done by the complainants and suffered by the respondents will be shown in the proof. All other allegations of said bill not in the answer admitted or denied, were then generally denied, and strict proof demanded of any and all allegations of said bill.

Proof was taken on the issues thus presented and the cause came on to be heard by agreement before the Chancellor at Chambers on the 1st day of May, 1924, upon the pleadings, proof on file and argument of counsel, from all of which the court was of opinion that the complainants were entitled to the relief sought by their bill; that they were entitled to recover of the defendants the sum of $254.88, the amount sued for, together with interest from the date of the filing of the bill in the sum of $29.67, in all the sum of $284.56, for which he gave a decree, awarding execution for the same, and for costs.

In said decree it was recited that "both parties reserved exceptions in the face of the depositions to certain evidence, all of which exceptions are by the court overruled as being immaterial. To the action of the court in overruling their exceptions, the parties respectively except."

To this decree the defendants reserved exceptions and prayed, obtained and perfected an appeal to this court, and have assigned errors, as follows:

I. "The Chancellor erred in pronouncing judgment against the appellants in any amount whatever."

II. "The Chancellor erred in failing to find as a fact that the complainants had breached their contract entered into by them."

III. "The Chancellor erred in adjudging the costs of the cause against the defendants in this case."

IV. "The Chancellor erred in admitting the testimony of John L. Manor, T. M. Atkins and P. E. Collett wherein their testimony contradicts the terms of the written contract filed by them, and in overruling the exceptions of the complainants taken to this testimony."

Inasmuch as the proof failed to show that there remained upon the land any tanbark in any considerable quantity, or that might have consumed the advancement remaining in the hands of the defendants, which under the contract complainants would still have the right to remove, we do not think the complainants' suit was barred simply because that during the life of the contract they may have been guilty of such a departure therefrom as to occasion the defendants damage; but under the Code such damages growing out of the original contract may be set off as against any recovery sought thereunder. Shannon's Code, sec. 4639; Blair v. Johnson, 3 Cates, 111-118. See, also, 3 Humphrey, 60-61.

We think these damages, if they had been sufficiently shown, have been sufficiently pleaded in the answer, wherein the items of

damage claimed were set out with particularity, and it was substantially averred that their aggregate would more than consume the complainants' claim. If true this was all that could have been claimed under the answer, as the recovery of any excess would have had to be supported by a cross bill. No cross bill, however, was necessary, if the allegations and proof of damages were designed only to defeat the complainants' recovery.

Have the defendants shown any definite sum as damages resulting to them for any of the alleged failures or breaches of contract on the part of complainants? The contract did provide, as stated in the bill, that the complainants bought all of the chestnut oak tanbark on all chestnut oak timber on said tract of land known as the John Miller tract, containing 400 acres more or less, and described as hereinbefore stated, and therefore it was not competent to attempt to show (there being no issue in the pleadings justifying or authorizing such proof) that there was a verbal agreement previously or even contemporaneously entered into that there was to be an exception of any part of the tanbark located within the boundaries of the Miller tract, under the elementary principle that parol proof is inadmissible to vary or contradict the terms of a valid written instrument, and therefore the Chancellor was in error in overruling the exception to the introduction of any proof excepted to that sought to do this. But as expressed by him, he regarded such proof as immaterial to the disposition of the case, and if that is true such ruling was harmless.

As indicated in the answer, there were numerous items of damage mentioned, from which it was averred that their aggregate would exceed the claim of complainants, but when it comes to the proof they are not sufficiently separated, traced and investigated to extricate any of them from hopeless confusion with other items likewise involved. There is a claim that the trees were cut too high—i. e., more than eighteen inches above the ground. Presumably it was intended to show by this that there was a loss of cross ties by subtracting these few inches lost in the stump from the necessary length of some cross tie, which otherwise would have been sufficiently long to constitute one, but if so the number and value of such ties, if any, or any aggregate feet of lumber that these few inches might have made, is not stated, nor is it ascertainable. This item goes to the scrap heap, or classifies as nominal. The same thing may be said as to the claim that the timber was to be cut with a saw, and due to the failure to do so some of it bursted.

As to the claim that they failed to peel all of the bark off of trees they had cut, the proof shows that there were a few of such trees, but it is likewise shown that there are tanbark trees that won't peel at all, and that some such were cut; and if this was a valid claim,

the amount, though small, is altogether speculative. Moreover as to some of these trees that were cut and from which all the bark was not taken, it is shown that defendants were to follow these operations with a tie enterprise, and that sometimes a tree would fall so low on the ground that it could not be peeled on the lower side without cutting the trunk; and as to such the defendants did not want the trees cut, fearing the loss of value in the timber, stating they would rather lose the bark left on the tree than risk the cutting of the timber by someone else. Such logs were not separated nor traced.

The claim that trees were cut in a way involving expense in cutting and removing the timber and preparing it for the saw, is likewise left without explanation or statement as to the amount claimed, or any array of facts from which the validity of the claim or its extent could be ascertained. Besides, a reference to the contract does not show that the complainants in cutting the timber were to do so as to facilitate the business of defendants in removing it, but the clause indicates that as little damage as practical was to be done to the remaining timber in felling the chestnut oak and taking out the bark.

It is claimed that they failed to remove all the bark from the woodland, and that some was left to spoil. In an almost hopeless search for this quantity, it is finally stated to be three or four piles not exceeding a wagon load, which the witness supposes to be still there, and that might be rotted. The time of his seeing it is left in doubt. Others failed to see it, and besides there was a second cleaning up, in which it might have been removed; and this is the effort at specification, except one other small, insignificant quantity involved in obscurity as to the amount.

There is a claim as to an unknown quantity of bark left in the tree tops and not taken from the limbs. As to such bark, the contract provides:

"In peeling said bark the parties of the second part are to peel the bark from only such limbs as is customary in peeling and marketing tanbark, and which can be peeled with a reasonable profit to the parties of the second part."

Some of the witnesses do say that they think more bark could have been profitably taken from the limbs, but how much, or to what extent, nowhere appears. Estimates that are merely extravagant guesses afford little aid in arriving at just conclusions. It is true that it is estimated by Mr. Nicely that there were forty cords in all that were left and wasted near the close of the work, when Mr. Collett informed him that the work was finished. Mr. Collett thought that there could not have been more than seven or eight cords, and rather than go over it again would have been willing to

make a small concession, but could not agree that there were forty. He did go over it again and cleaned up some more bark, something like the amount he thought might have been left when he talked with Mr. Nicely. It is therefore manifest that Mr. Nicely's estimate was not only based upon the vague, impossible items hereinbefore discussed, but also as to certain trees on that portion of the tract over which the controversy was had as to the exception. There was a certain portion within the Miller tract disconnected from the main woodland, and as to this it was claimed by the complainants that it had been verbally excepted out of the contract. This claim, as heretofore indicated, is not sufficient to have excused the leaving of any timber or bark from same thereon, but aside from this claim it was stated by Mr. Collett that after they began to peel (this being after the contract) Mr. B. H. Nicely told him also that they could use their pleasure as to whether or not they would take any on this little detached portion, and they advised the peelers not to peal it. Of course it was competent after the contract to verbally modify it to this extent. This permission was not in express terms denied by Mr. Nicely, although he went on the stand afterwards, though it is proper to state that he did say that he never at any time told any one not to cut any timber and remove the bark from it that was within the boundary. He may not have done this, yet he may have told them they might use their pleasure as to cutting this particular portion. Besides, if it be granted that there was an obligation to cut these trees, it is not shown that any damage was suffered by the defendants for the failure to do so; and it was shown that afterwards the timber, or most of it, was cut for the defendants, and the bark peeled by others.

As to the eleven trees mentioned in the stump statement, Mr. Collett said that Mr. Nicely told him there were six of these trees that were standing, and that he would just cut and take them. The complainants went over the ground again after the disagreement as to the forty cords and cleaned up and cut about six cords more bark, and went again in company with B. H. Nicely and W. P. Hickle and says he found two trees that they never cut, one small tree too small for ties, and another the men claimed was a turkey oak. Mr. Collett was asked:

"Q. Now Mr. Nicely testifies about eleven trees that were not cut thereon that land, meaning the eleven tanbark trees; will you state what the facts are about that? A. Well, Burl Nicely made a complaint to Mr. Atkins and me after it was too late to peel those trees, and said there were six, and asked us if we cared for him going ahead and cutting them and taking them to the mill. We told him we did not."

"Q. Now when you say it was too late, what do you mean by that? A. The bark season was over, and they went back before he told us about it."

"Q. How did those trees happen to be left? A. By not knowing where the line was."

"Q. You did not know the exact boundary? A. No, I did not; couldn't gather no information."

"Q. Did Mr. Burl Nicely indicate that he wanted any damage off of you for these six trees that he talked to you and Mr. Atkins about? A. He did not. He just wanted to cut them, he said. He just wanted to cut them and take them in. He didn't know where they was at the time, and he just wanted to take them in."

"Q. Some of the witnesses in this case have testified about seeing a few trees, something like three or four trees cut that were not peeled. If that is true, you may state why they were not peeled. A. They wouldn't peel on account of the sap being down. That's the case most often in my experience."

"Q. You always find some trees that won't peel? A. I have always."

"Q. I will ask you whether there is a difference in trees about peeling at the top. A. There is."

. . . . . . .

"Q. Did you go over this land with Burl Nicely after the removal of the bark was completed? A. I did."

"Q. Did you cover the entire boundary pretty well? A. We did."

"Q. Now what if any complainant did he make at that time? A. He never made any, except a few stumps that he said uncle Pete Buler had cut a little too high."

"Q. Did he claim that they were damaged by that fact? A. He did not, he said it was all right."

"Q. It appears in this record you went over the territory a second time and cleaned up this bark. I will ask you to state whether or not you went over the entire territory. A. I did."

"Q. Why were you going over it? A. To fleece up on the bark."

"Q. Did you fleece it up? A. I did, had it done."

W. P. Hickle was with them on the last occasion. He said: "We started over the ridge, and got up on the side of the ridge, and he made mention to Collett that there stood a tree that woud have made across ties, and ought to have been peeled. Collett said he didn't know whether it would make a tie or not, and Mr. Nicely said he thought it would." He was further asked:

"Q. Did Mr. Burl Nicely on that occasion make any other objection to the manner in which that bark had been gotten out, except with reference to that tree? A. We went up farther and found a tree that had not been peeled, and he made mention something about that tree, and Collett made mention that maybe sometimes you get a tree that wouldn't peel, and I don't remember whether Mr. Nicely said yes or not. I wouldn't say for sure about that."

"Q. What else did he say, if anything with reference to the manner the bark was gotten out? A. He said something about the stumps being cut too high."

"Q. Was that all the objections he made to it? A. We went over the other side of the road next to the creek, and he said something about the bark being left on a tree, about peeling it."

"Q. One tree? A. No, he said something to me about did I know how much bark was left on a tree, and I said I didn't, and he said there was something like one-fourth left on the bottom side of the tree."

"Q. Was there any other objection made by Mr. Burl Nicely? A. If there was I don't remember it."

He stated also that sometimes a fellow will strike a tree that will peel up all right, and sometimes you strike them that won't; that it looked like a fairly good job to him. He also stated that he had been over there and had peeled bark, and when they went back to gather up the scraps someone had snaked down the hill through it, and that someone had been snaking logs there, and they said it was Mr. Nicely's timber. The trees would figure about five or six to the ton or cord.

Without any further discussion we think, and find, that there was a substantial compliance with the contract. On this large territory, and with two operations going on, it was impossible but that some of it must have been wasted, and possibly some small piles of bark here and there overlooked, with the escape of an occasional tree, as in the case of the two finally mentioned, and that the defendants have not shown at least anything more than nominal damage. Allowing them this in the sum of one dollar, the Chancellor's decree will be modified to this extent, and otherwise affirmed, with costs against appellants and their security, with the exception of one-half the costs of this court, which will be paid by appellees.

Portrum and Thompson, JJ., concur.